# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION


**RUDOLPH ALEXANDER,**

        **Plaintiff,**

**v.**

        **Case No.: 2:07-cv-1116**
        **JUDGE SMITH**
        **Magistrate Judge King**

**OHIO STATE UNIVERSITY**
**COLLEGE OF SOCIAL WORK,** *et al.***,**

        **Defendants.**


## OPINION AND ORDER

Plaintiff Dr. Rudolph Alexander brings this action against Defendants The Ohio State University College of Social Work, Lawrence Lewellen, William Meezan, and The Ohio State University (collectively "Defendants") pursuant to Title VII and 42 U.S.C. § 1983. Plaintiff asserts claims of race discrimination, retaliation, and violation of his civil rights.[1] Defendants now move for summary judgment and/or qualified immunity on Plaintiff's claims (Doc. 55). Plaintiff has responded, and this matter is now ripe for review. For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment.

As a preliminary matter, Plaintiff recently filed a Motion for Leave to File a Supplemental Affidavit (Doc. 71). Defendants oppose Plaintiff's Motion. The Court, however, finds that Plaintiff is simply clarifying information submitted in his first affidavit, and there is no prejudice to Defendants. Accordingly, Plaintiff's Motion is **GRANTED**.

---

[1] The Court previously dismissed Plaintiff's destruction of public records claim in ruling on Defendants' Motion for Judgment on the Pleadings (Doc. 35).

# I.    FACTS

Plaintiff is an African-American citizen of the State of Ohio, employed by Defendant Ohio State University as a tenured professor of Social Work at the College of Social Work. The College of Social Work is a college within The Ohio State University. Defendants The Ohio State University and the College of Social Work are governmental units of the State of Ohio. Defendant Lewellen is the Associate Vice President for Human Resources of The Ohio State University. Defendant Meezan is the Dean of the College of Social Work. The College of Social Work employs approximately 6 full professors, 12 associate professors, and 6 assistant professors.

Plaintiff began working as an assistant professor on September 1, 1989. Plaintiff's negotiated salary when he began was approximately $31,500.00, which Dean Richard Boettcher told him was comparable to other similarly situated professors, and the maximum that could be paid. Approximately three years later, Plaintiff learned that Dean Boettcher offered a higher salary to a female professor, Dr. Julia, who started the same year as Plaintiff. Plaintiff raised this issue with the Dean, and an adjustment was made to his salary to account for the discrepancy.

Plaintiff worked his way up through the ranks of the faculty at the College of Social Work. Plaintiff obtained tenure in 1995. During his employment, Plaintiff describes that he has published books, articles, given presentations, has been very involved in the community and received awards. Plaintiff was appointed as Director of the Bachelor of Science and Social Work Program in 2000. In that capacity, he administered the social work undergraduate program.

The majority of Plaintiff's problem began to arise after Dean Meezan was hired as the Dean of the College of Social Work in July 2005.[2] Two weeks after Defendant Meezan became Dean of the College of Social Work, he suggested that students should sign a pledge when entering the college that would support the National Association of Social Workers' ("NASW") Code of Ethics. Defendant Meezan suggested this as a "rite of passage" into the professional social work community. (Meezan Dep. I at 14-19). The NASW code binds all social workers in their professional practice and addresses how minority groups, including homosexuals, are to be treated. (Meezan Dep. I at 15; Alexander Dep. I at 15-20). Plaintiff took issue with this pledge and apprised the Dean that enforcing such a pledge may raise religious objections. *Id.* Plaintiff also surmised that some students would possibly file complaints and/or pursue legal action as a violation of their civil rights. *Id.*

Plaintiff suggested that the Dean consult with OSU's legal department prior to enacting the pledge requirement. *Id.* Dean Meezan has denied that the pledge was one of forcing students to accept homosexuality and instead stated that it was merely to insure compliance with the Code of Social Workers. Plaintiff emphasizes that Dean Meezan is gay and has admitted so publicly. (Meezan Dep. I at 9). Plaintiff further states that the signing of the pledge has never been implemented. (Alexander Dep. I at 22).

In 2005, Plaintiff was informed that several female professors were given extra pay that they did not earn by Dean Tripodi. Plaintiff, remembering that there was prior pay discrimination on the basis of gender, sought records regarding the salaries of all the faculty members at the College. (Alexander Dep. I at 24). Plaintiff describes that Dean Meezan was

---

[2] Plaintiff was a member of the search committee that hired Dean Meezan, and Plaintiff supported his hiring at the time.

upset with Plaintiff for requesting this information and told him so.  (Alexander Dep. I at 24-25).

Plaintiff was denied the information because OSU's legal department had apprised the Dean that

it did not need to provide the information to Plaintiff.  Although he still believed that he was

discriminated against,  Plaintiff dropped the matter.  (Alexander Dep. I at 27).

Plaintiff alleges that as a result of his request for the aforementioned information, Dean

Meezan began engaging in race discrimination and retaliation around March 2006.  Plaintiff was

asked to resign from his Director's position of the Bachelor of Science and Social Work Program

which he had held since 2000.  Plaintiff asserts that when Dean Meezan began in July 2005, he

asked him to remain as the director for two more years.  (Alexander Dep. I at 36-37).  However,

Dean Meezan states that he asked Dr. Alexander to "see me through my transition," but never

put a time frame on this expectation.  (Meezan Dep. I at 145).

Plaintiff claims that there had been no prior warning of performance problems.  Pursuant

to the Ohio State University's Office of Academic Affairs Policies and Procedures Handbook,

Volume 2, pg. 84, a professor is to be provided with prior written notice of performance

deficiencies, so as to permit them the opportunity to rectify the situation. (Handbook attached as

Exhibit 1 to Pl.'s Memo.).  There are no records documenting any performance problems by

Plaintiff.  However, Plaintiff did have a "task sheet," that included developing new courses for

the program, adding an interdisciplinary minors program (e.g. in social justice), and developing

an honors program.  (Alexander Dep. I at 37-40).  Plaintiff made very little progress in these

areas.  According to Defendants, Dean Meezan's decision to ask Plaintiff to step down was

motivated by his failure to make significant progress on the above tasks, his passivity, lack of

commitment to the directorship; breach of confidence; and refusal to attend the evening of

recognition graduation ceremony. (Meezan Dep. I at 190-191; Meezan Aff. at ¶ 2; Alexander Dep. I at 34-35, 44-45, 74-75, and 143).

Dr. Jacqueline Monroe, an African-American female, was appointed as the Director of the Bachelor of Science and Social Work Program, replacing Plaintiff. Plaintiff maintains that her selection was a mere contrivance to defeat his race discrimination claim and that Dean Meezan improperly induced her to take the job by offering her an extra $5000 to cover her child care expenses. (Alexander Dep. II at 13-15). However, according to Dr. Monroe, she did not receive any additional compensation other than the 2/9 salary stipend that comes with administrative responsibilities. (Monroe Dep. at 25-30).

Plaintiff alleges that additional discrimination and retaliation occurred during the 2006 annual evaluation when Dean Meezan gave Plaintiff a 1.5% raise, the lowest among the approximately 25 professors in the college. During the evaluation process, teaching faculty receive ratings of no merit, merit, or extra merit in the areas of research/scholarship, teaching and service. In-between ratings of partial merit, merit plus or extra merit minus are also possible. Ratings are based on the written dossier submitted by faculty, which includes a resume and supporting documentation. If no dossier is submitted, a faculty member does not receive a raise.

Dean Meezan met with Dr. Alexander in May 2006 to discuss this evaluation and had an "intense discussion." (Alexander Dep. I at 77-78, 91-92). Although during the meeting, Plaintiff was informed he would receive partial merit in the area of scholarship, Dean Meezan permitted Plaintiff to supplement his dossier and increased his score to merit. (Meezan Dep. I at 89-90; Alexander Dep. I at 90). In June 2006, Plaintiff received a letter from Dean Meezan notifying him that he received a rating of merit in scholarship, teaching and service, and a rating

of partial merit in administration.  (Meezan Dep. I at 188-89; Alexander Dep. I at 90, 105).  The 1.5% annual raise was based on this rating.  Plaintiff expressed his outrage over this minimal raise by calling the Dean a "liar," and stating "You can expect a response from me for your racist behaviors, both legal and personal."  (Alexander Dep. I at 100-01).

In September 2006, the Office of Human Resources developed a climate survey to gauge how Dean Meezan was doing as an administrator and to assist the college in it strategic planning process.  As part of his investigation of discrimination, Plaintiff requested the results of the survey, but was informed he would have to wait until mid-November for the individual surveys and unredacted written comments.  However, on November 21, 2006, Plaintiff was informed by Mr. Lewellen that the survey results had been destroyed.[3]  The survey results were then produced to Plaintiff, but Plaintiff believes they were altered.

On September 4th and 14th, 2006, Plaintiff complained to Ohio State's Provost Office accusing Dean Meezan in engaging in "invidious, blatant and malicious racial discrimination," as well as demonstrating a bias towards homosexuals in issuing the 2005 and 2006 raises.  The complaint was referred to Ohio State's Human Resources consultant Shannon Washington.  On November 28, 2006, Plaintiff requested that Washington terminate her investigation.  In this request, Plaintiff referred to Dean Meezan as a "spineless weasel" and stated he does not intend to "kiss Meezan's ass" to find out how Meezan arrived at his rating.  (Alexander Dep. I at 194-96).  Washington proceeded with her investigation despite Plaintiff's request and issued a finding on December 19, 2006, that no discrimination occurred.

---

[3] This matter has been thoroughly briefed with respect to Plaintiff's Motion to Compel (Doc. 47) and will be addressed by the Court in a separate Order, if necessary, following the resolution of Defendants' Motion for Summary Judgment.

Plaintiff's outrage against Dean Meezan continued. In an email dated November 10, 2006, Plaintiff called Dean Meezan a pathological liar multiple times. Further, Plaintiff wrote:

> In effect, it is going to take a seven figure settlement to get me to drop this case. . .. At this point, I am totally disgusted. Every time I see Meezan, I want to punch him in the face and this is putting it mildly.

> If Ohio State thinks that it can portray me as a disgruntled employee who was removed from an administrative position for poor performance and is playing the race card, then it will not work. I have a lot on Meezan and a court fight could get very ugly.

(Alexander Dep. Ex. 129-30).

On December 1, 2006, Plaintiff filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and also with the Equal Employment Opportunity Commission ("EEOC"), alleging that the raises he received in 2005 and 2006 discriminated against him on the basis of his sex and race and in retaliation for filing public records requests. The EEOC issued a no probable cause finding and a right to sue letter on August 7, 2007.

Plaintiff also complains of his low raise of 2.47% in the 2007 special salary adjustment and no salary increase during the 2007 annual evaluation. However, Plaintiff failed to submit a dossier which is required to receive any raise. Plaintiff contends that another Professor, Lee Ann Mjelde-Mossey, requested someone other than Dean Meezan to conduct her 2006-07 evaluation due to a conflict between them. Dr. Mjelde-Mossey made such a request prior to the dossier submission deadline and it was granted. (Alexander Dep. II at 57-60; Meezan Dep. I at 107-09). Plaintiff attempted to make such a request, but it was well after the dossier submission deadline and his request was denied. Plaintiff made a timely request for the 2007-08 academic year, and it was granted.

Plaintiff continued to voice his grievances against Dean Meezan. In a July 31, 2007 e-mail to Dean Meezan, Plaintiff again called him a liar. He also sent e-mails to President Gee and Provost Joe Alutto and Vice Provost Carol Anderson calling Dean Meezan a liar. Plaintiff also sent a memorandum to Alutto and Anderson accusing Dean Meezan of blatant lies, corruption and illegal salary adjustment structure, "blatant racism" and "racist nonsense." (Alexander Dep. Ex. 146). Further, Plaintiff accused the entire Salary Adjustment Committee of demonstrating a racial bias in rating him unfairly, as well as the Provost's Office for failing to grant his tardy request to be evaluated by someone other than Dean Meezan. (*Id.*).

On April 3, 2007, Plaintiff filed another charge of discrimination with the OCRC and the EEOC alleging that the 2007 special salary raise discriminated against him on the basis of his race and was retaliatory. (Alexander Dep. II at 54-55; Alexander Dep. Ex. 141).

Plaintiff voiced his grievances in the classroom as well. In a course entitled "Minority Perspectives," Plaintiff used his complaints against OSU as course material, going so far as to distribute a handout to students complaining that his own salary was an example of rampant racism. (Alexander Dep. II at 54-55; Alexander Dep. Ex. 142). Several students complained to Dr. Monroe that such a diatribe was irrelevant to the course content. (Monroe Dep. at 21). Plaintiff also referred to Dean Meezan as "gay" and a "leprechaun" in that same class. (Alexander Dep. II at 86-89). Plaintiff also spread a rumor to at least two OSU faculty that Dean Meezan had AIDS.

As a result of Plaintiff's conduct, on March 5, 2008, Dean Meezan filed a complaint against him with OSU's Human Resources office. The complaint detailed much of the conduct described in the aforementioned facts. After an investigation, OSU issued a report on January

30, 2009, finding that Plaintiff had engaged in most of the conduct complained of, that his conduct was reprehensible, and that if it continued, further disciplinary action would be taken.

## II.    STANDARD OF REVIEW

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[4] The Court disregards all evidence favorable to the moving party that the

---

[4] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving

jury would not be not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

---

party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

## III.    DISCUSSION

Defendants move for summary judgment and/or qualified immunity on each of Plaintiff's claims of race discrimination, retaliation, and violation of his civil rights.  The Court will address each of Plaintiff's claims in turn.

### A.    Race Discrimination

Plaintiff alleges that he was discriminated against because of his race when (1) he was replaced as Director of the Bachelor of Science and Social Work Program; (2) he was given evaluations in 2006 and 2007 that resulted in low raises; and (3) he was not provided the climate survey responses he demanded.

Plaintiff brings these claims under both Title VII and the Equal Protection Clause pursuant to 42 U.S.C. § 1983.  Claims of discrimination under Title VII and  42 U.S.C. § 1983 are analyzed using the same basic evidentiary framework.  *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000) (*citing Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988); *Daniels v. Board of Educ.,* 805 F.2d 203, 206-07 (6th Cir.1986); *Grano v. Department of Dev.,* 637 F.2d 1073, 1081-82 (6th Cir.1980)).  Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1).  To succeed under a § 1983 claim, Plaintiff must demonstrate that the individual Defendants personally participated in, or ratified, the discrimination. *See Adair v. Charter County of Wayne*, 452 F.3d 481, 493 (6th Cir. 2006) (*citing Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694-95 (1978).

In order to establish a discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of

discriminatory treatment. *White v. Columbus Metropolitan Housing Auth.,* 429 F.3d 232, 238 (6th Cir. 2005). Plaintiff has not offered direct evidence of race discrimination[5], but contends he can state a *prima facie* case of race discrimination using circumstantial evidence.

The elements of a *prima facia* case of employment discrimination based on race are: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and (4) that the defendant did not subject similarly situated persons outside the protected class to such adverse action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *See Id.*; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See Id.*; *Burdine*, 450 U.S. 248, 253. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S.248, 253. This burden-shifting framework is intended to be flexible in differing factual circumstances. *See Christian v. Wal-Mart Stores, Inc,*. 252 F.3d 862, *869-870 (6th Cir. 2001), *citing Burdine,* 450 U.S. at 254 n. 6.

---

[5] Plaintiff has admitted he has no such direct evidence.

This same test has been applied when the claim involved a salary increase. *See Thomas v. Compuware Corp.*, 105 Fed. Appx. 60, 65 (6th Cir. 2004).

The Court will evaluate whether Plaintiff has established a *prima facie* case of discrimination with respect to each of his claims of discrimination: (1) demotion as Director of the Bachelor of Science and Social Work Program; (2) evaluations in 2006 and 2007 that resulted in low raises; and (3) not receiving the climate survey responses.

**1.    Demotion as Director of the Bachelor of Science and Social Work Program**

    *a.    Prima Facie Case*

There is no dispute that Plaintiff is an African-American and therefore a member of a protected class. Nor is there any dispute that Plaintiff was qualified for the position.

A discrimination claim must ordinarily involve a materially adverse employment action. *Kocsis v. Multi-Care Management*, 97 F.3d 876 (6th Cir. 1996). A materially adverse employment action ordinarily includes termination, a decrease in salary or less distinguished title, a material loss of benefits, significantly diminished responsibilities, and the like. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461-62 (6th Cir. 2000). A performance evaluation that directly impacts an entitlement to an increase in salary is an adverse employment action. *See, e.g., Gillis v. Georgia Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005).

Plaintiff alleges that he suffered an adverse employment action when he was demoted as Director of the Bachelor of Science and Social Work Program. Defendant, however, argues that it was not an adverse action because it was giving Plaintiff what he wanted. Plaintiff had written and confirmed under oath that he stated he "did not want to serve as BSSW Director in [Dean

-13-

Meezan's] administration." He further stated that "I didn't want to work under him after I saw" how the Dean behaved. (Alexander Dep. I at 97-98). Regardless of Plaintiff's comments, the Court finds that Plaintiff suffered an adverse employment action because he did not willfully leave the position–he was asked to step down.

To be deemed "similarly situated," the comparable employee "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In determining whether an allegedly comparable employee is similarly situated, the ultimate question is whether "all of the *relevant* aspects of [his] employment situation were 'nearly identical' to those of the [comparator's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998).

Defendants argue that Plaintiff cannot establish this final element because he was replaced by a member of the same protected class, Dr. Jacqueline Meshelemiah, an African-American. Plaintiff, however, contends that the Dean selected another African-American for the position with the intent to cover himself from a potential lawsuit. Plaintiff urges the Court to apply an alternative test that allows for other evidence of discrimination. The Sixth Circuit has recognized that departure from the *McDonnell Douglas* analysis is permitted "if the facts should warrant it," e.g. if there is overwhelming evidence of pretext. *Harmon v. Earthgrains Baking Cos.*, 2009 U.S. App. LEXIS 2996 (6th Cir. Feb. 11, 2009). But, Plaintiff here, did not advance "any justifiable reason why the Court should not use [the *McDonnell Douglas* analysis] to analyze his claim." *Id.*

Plaintiff relies on *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir. 1996), in support of his argument that he can still establish a claim of discrimination regardless of the fact that his replacement was of the same class. That one's replacement is of another race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition. *See generally Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *see also McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 279 (1976).

The court held in *Carson* that regardless of the aforementioned conclusion, the plaintiff had not established a *prima facie* case of discrimination. The court acknowledged that the employer's explanation for plaintiff's discharge–"that Carson was a mediocre employee who could not get along with co-workers and was let go to restore harmony within the department–is unrelated to race." *Carson*, 82 F.3d at 159. Plaintiff Carson agreed that someone had to be let go but asserted that a black co-worker should have been fired instead of her. The court stated in response that "the difficulty with this reply is that the federal courts are not arbitral boards, ruling on the strength of "cause" for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is race." *Pollard v. Rea Magnet Wire Corp.*, 824 F.2d 557 (7th Cir. 1987)." *Id.*

Here, Plaintiff asserts that he "has brought forth evidence questioning the real reason why the Dean selected another African-American for the position." (Pl's Memo. in Opp. at 15). He further states that he has "presented evidence showing that the Dean was motivated by intent to cover himself for a potential lawsuit." (*Id.*). Plaintiff states that he "made him aware that he was going to sue him due [sic] for discrimination with regard to his request for salary information and other matters." (*Id.*; *see also* Ex. 6, Pl.'s July 3, 2006 Memo to Dean Meezan). Plaintiff asserts that Dean Meezan replaced him with an African-American, Dr. Jacqueline

Meshelemiah, to avoid a lawsuit. Plaintiff alleges that his replacement was bribed to accept the position, with an additional $5000.00 to cover child care expenses, in violation of University regulations. Plaintiff, however, does not have any evidence of such a payment. He claims he was told this by Dr. Monroe, who testified in her deposition differently. Plaintiff argues that this is a factual dispute that would have to be resolved by a jury. The Court does not agree. Plaintiff has not presented any evidence that he was treated any different from other similarly situated persons. Further, even if Plaintiff did have evidence of the alleged bribe, such evidence that the Dean went to extraordinary lengths to promote an African-American to replace Plaintiff does not create an inference that Dean Meezan is prejudicial to African-Americans.

Plaintiff also argues that he was treated differently than other administrators, however, he has failed to specifically identify these other administrators and provide any evidence regarding how they were treated differently. Apart from conclusory allegations, Plaintiff has not presented any evidence that he was removed from the Director position for racially discriminatory reasons. Therefore, Plaintiff has not met his burden to establish that he was treated differently than other similarly situated professors and/or administrators, and consequently, he has failed to establish a *prima facie* case of disparate treatment based on race. Accordingly, Defendants are entitled to summary judgment on this claim.

*b.*     *Pretext*

Defendants argue that even if Plaintiff is able to make a *prima facie* showing of racial discrimination, Plaintiff's claims must fail because Defendants had a legitimate business reason for removing him as Director of the Bachelor of Science and Social Work program. This Court agrees.

"An employee can show pretext by offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently caused [the] employer to take the action it did) are not true.'" *Id.* (*quoting Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)). In examining whether the stated reason is pretext, the Court must determine whether the employer reasonably relied on the particularized facts before it at the time it made the employment decision. *Smith*, 155 F.3d at 807. The employer is not required to show that it left no stone unturned; rather, the issue is whether the employer made a reasonably informed and considered decision before taking the adverse employment action. *Id.* The Court should not blindly accept the proffered reason as honest. *Id.* If the employee adduces evidence establishing that the employer failed to make a reasonably informed and considered decision, then its decisional process is "unworthy of credence," and any reliance by the employer on such a process cannot be deemed "honestly held." *Id.* at 807-08.

In the instant case, Defendants have articulated legitimate, non-discriminatory reasons for removing Plaintiff as Director of the Bachelor of Science and Social Work Program. Dean Meezan has offered several reasons for asking Plaintiff to resign, including that Plaintiff did not create a Social Justice Minor, nor develop an Honors Program as instructed. Further, Plaintiff refused to attend the graduation ceremony in June 2006.

Plaintiff does not deny that the aforementioned reasons were given when he was asked to resign, but asserts that such reasons are pretext. Plaintiff asserts three arguments to establish pretext. First, Plaintiff alleges that Dean Meezan's reasons were factually false. Second,

Plaintiff maintains that Dean Meezan's "shifting" reasons for his removal create an inference of pretext. Finally, Plaintiff claims that the Dean's failure to generate greater documentation of his performance deficiencies is evidence of pretext. (Pl.'s Memo. at 18-28).

Plaintiff argues that Dean Meezan's criticism of Plaintiff's work effort is contradicted by his recognition of such. Plaintiff contends that on March 27, 2006, Dean Meezan indicated that Plaintiff did not move fast enough on creating a Social Justice Minor and developing an Honors Program. Plaintiff then states that he was given two additional reasons for seeking his resignation, including allegedly divulging confidential information and refusing to attend the graduation ceremony in 2006. Apart from the divulging confidential information which Plaintiff contests, he does assert that any of the other reasons are factually false. He simply makes the conclusory allegation that "it was evident that it was the Dean's intent to terminate the Plaintiff because of his race and in retaliation for his prior claim of discrimination." (Pl.'s Memo. in Opp. at 18).

Plaintiff relies on the testimony of Professor Monroe who stated that after Dean Meezan was hired, he said he had a group of faculty and staff that he was going to get rid of, including Plaintiff and Diana Ramsey. (Monroe Dep. at 41, 43). Plaintiff represents that Dean Meezan vocalized disagreement with Ms. Ramsey because she was a Republican. Plaintiff further argues that Dean Meezan was not opposed to removing persons from employment based upon illegal criterion as he was "found guilty" of attempting to limit the number of Asian faculty members by the OSU Human Resources Department. Plaintiff relies on Ex. 58 to his Memorandum in Opposition which is a Confidential Memo to Provost Joseph Alutto and Vice President Larry Lewellen from Olga Ewquivel-Gonzalez with the Human Resources Office. There was no finding of guilty, but rather the human resources office found that Dean Meezan acted

inappropriately in his charge to the search committee, which consisted of a statement that foreign born Asian applicants would not count for purposes of diversity. Regardless of this charge, Dean Meezan considered what appeared to be Asian surnamed applicants, and the committee considered all applicants regardless of national origin. (*See* Ex. 58 to Pl.'s Memo. in Opp. at 9).

Plaintiff also attempts to assert reasons why he did not move more quickly in implementing the Dean's initiatives, such as the Honors Program and the Social Justice Minor. Plaintiff describes that Dean Meezan indicated in an email to him that he was pleased with the progress he was making on the Honors Program and Social Justice Minor. This last commendation occurred in mid-December 2006. There is no dispute that Dean Meezan was pleased that Plaintiff was initially making progress on these projects, but Plaintiff offers no explanation was to why he failed to continue to develop the programs despite that Dean's deadline of June 2006. (Meezan Dep. I at 111, Alexander Dep. I at 46-48, 50-54, 60-61). Plaintiff also asserts that he could not unilaterally create programs and courses alone. There is no question that there was a committee that ultimately approved these programs, but this does not change the fact that Dean Meezan did not believe that Plaintiff was doing enough to develop these programs. It is not enough for Plaintiff to disagree with Dean Meezan's evaluation of his performance, he needs to show that Dean Meezan could not possibly have reasonably relied on the factors on which he based his decision. *See Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007), cert. denied, 128 S. Ct. 1657 (2008).

With respect to Plaintiff's failure to attend the graduation ceremony, Plaintiff argues that Dean Meezan does not have any documentation of his position. Plaintiff claims that Dean Meezan knew of his pre-arranged vacation plans, which included the purchase of a nonrefundable airline ticket. Plaintiff asserts that the only persons required to attend graduation

are deans, which is an Ohio State Policy. Regardless of the policy, it appears Dean Meezan merely wanted Plaintiff to attend and he refused. This, however, was not the sole basis for seeking Plaintiff's resignation, and Plaintiff cannot establish that the other bases articulated were a pretext for discrimination.

Next, Plaintiff argues that Dean Meezan continued to shift his reasons for seeking Plaintiff's resignation and this establishes pretext. In the Human Resources Report, Dean Meezan told the investigator that Plaintiff was late with data for the McHale Report, however, in his deposition, Dean Meezan stated that there was no problem with the McHale Report. Dean Meezan also indicated that Plaintiff did not attend any Professional Advisory Committee Meetings, but Plaintiff establishes that he attended some and missed some, just like his Caucasian counterpart, Dr. Tom Gregoire, Administrator of the Master of Social Work Program. Plaintiff also asserts that the first time Dean Meezan spoke to him about alleged work performance problems was the day he asked him to resign and such failure to document the rationale for termination can be evidence of pretext. *See Everson v. The Board of Education of the School District of Highland Park*, 123 Fed. Appx. 221, 233 (6th Cir. 2005).

Though the Court is concerned with the appearance of shifting reasons for seeking Plaintiff's resignation, it appears that Defendants were merely listing as many reasons as possible in support of their decision. Further, Defendants were questioned a variety of different times, during the HR investigation, the EEOC investigation and the depositions. Plaintiff's testimony generally does not contradict Dean Meezan's reasons for seeking Plaintiff's resignation, but rather makes excuses. There is even less of "shift" here than in *Fitzpartrick v. Henderson*, 55 Fed. Appx. 248 (6th Cir. 2002), where the plaintiff was given one reason for why he denied the extension, but given others during his deposition and EEOC testimony, and still

other reasons later. Regardless, the Court found that even if he did not give all his reasons up-front, which he was not required to do, his later explanations of the reasons were supported by the Plaintiff's own testimony.

Finally, no inference of pretext can be drawn by the lack of written evidence or the lack of progressive discipline. In conclusion, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to adduce evidence from which a rational trier of fact could reasonably infer that Defendants' proffered reasons had either no basis in fact or were not the actual reason he was asked to resign as the Director of the Bachelor of Science and Social Work Program. Thus, Plaintiff is unable to establish pretext as a matter of law. For this additional reason, Defendants are entitled to summary judgment in their favor on Plaintiff's claim of race discrimination.

### 2. Plaintiff's 2006 and 2007 Evaluations That Resulted in Low Raises

Plaintiff asserts that the amount of his raises in 2006 and 2007 was discriminatory when compared with the other professors. Plaintiff asserts that although he had an administrative position in 2006, he was still evaluated on teaching, scholarship and service, and thus, he was similarly situated to all the other faculty who are also evaluated based on those categories. Plaintiff relies on *Amini v. Case Western Reserve Univ.*, 5 F. Supp.2d 563, 567 (N.D. Ohio 1998), which held that professors can be similarly situated where they are subject to the same standards of review for tenure even though one of the comparables was not on the tenure track, and others were considered for tenure by different committees, deans, and advisory committees, in different years.

Defendants argue, however, that Plaintiff is only similarly situated to Drs. Gregoire and Burke with respect to his evaluation for administration in 2006. Dean Meezan weighted the evaluations of faculty with administrative responsibilities, such as Plaintiff, as 50% for administration and 50% for the combined categories of teaching, scholarship and service. This is a change from the procedure under Dean Tripodi, who included administrative duties under service.

The employee with whom Plaintiff seeks to compare himself must be similar in all relevant aspects. *See Ercegovich*, 154 F.3d at 352. In announcing the "all of the relevant aspects" standard, *Ercegovich* narrowed the Sixth Circuit's prior holding in *Mitchell*, which had required that the plaintiff and the comparable employee be "similarly situated in all respects." *Id.*; *see also Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002).

The highly contested issue here is whether Plaintiff should only be compared to other professors who also had administrative duties or whether he can be compared to all the other professors generally. The Court is concerned with Defendants' argument that Plaintiff is only comparable to two other professors who were also administrators, in that such a narrow definition of "similarly situated" could effectively remove Plaintiff from the "protective reach of the anti-discrimination laws." *Jackson v. FedEx Corporate Servs.*, 518 F.3d 388 (6th Cir. 2008). However, in *Johnson v. The Kroger Co.*, 3189 F.3d 858 (6th Cir. 2003), the Court found that the employees the plaintiff argued were similarly situated were not, because, with the exception of one, they did not have the same responsibilities or occupy managerial-level positions. As applied to this case, the fact that Plaintiff was an administrator is important, and any professor to whom Plaintiff assets her is similarly situated must also have administrative duties. Plaintiff's 2006 raise was based on his rating of merit in scholarship, teaching and service, and his rating of

partial merit in administration. Plaintiff has failed to establish that the evaluation procedure was applied differently to him than other professors with administrative responsibilities.

Even if the non-administrative faculty can be deemed similarly situated, Plaintiff has no evidence that the evaluation criteria was applied inconsistently by Dean Meezan. Plaintiff's point-by-point disagreement with the scores he received for teaching, research, and service show no more than his own subjective belief that he should have been scored higher. In this regard, Plaintiff has asserted that other professors were treated more favorably. In the area of teaching, Plaintiff argues that he was not given credit for the creation of a course in Social Justice in 2006, but another professor, Betty Speziale, a white female, developed a new course and received credit. With respect to scholarship, Plaintiff asserts that he was treated differently than Professors Virginia Richardson, Keith Kilty, and Gil Greene because the Dean gave them credit for a book that came out in print during the evaluation period, but Plaintiff did not receive credit for his book. The final category, service, Plaintiff asserts that he did not receive credit for serving as chair of the Bachelor of Science and Social Work Performance Review Committee, serving on the Education Policy Committee and the Professional Advisory Committee. Plaintiff argues that Professor Raiz, a white female, did receive credit for her service on the Curriculum Committee; Professor Warren, a while male, received credit as Chair of the Research and Involvement in College Committee; and Theresa Early, a white female, received credit for service on college committees.

Though the Court could closely examine all the other faculty and possibly determine that Plaintiff should have received some additional points for scholarship, teaching, and service, such an examination would not change the fact that those categories only comprise 50% of his overall rating, with the other 50% was based on his administrative duties. Likewise, Plaintiff's

comparison of his salary increases with those of other faculty members does not show any impact of alleged discrimination. Though it is true that Plaintiff's salary increases were low, he has not demonstrated that he was qualified for a higher score. In sum, Plaintiff's allegations show neither disparate impact, nor do they show discriminatory animus. As the Sixth Circuit stated, "the mere presence of a disparity in an employer's work force is not enough to establish a *prima facie* case of disparate impact. Disparities occur naturally in work forces for a multitude of non-discriminatory reasons." *Abbott v. Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990).

Plaintiff has failed to establish a *prima facie* case of race discrimination in his 2006 and 2007 pay raises.[6] Plaintiff has established that he was a member of a Title VII protected class and that he was subject to an adverse employment action in the form of a lesser salary increase. However, Plaintiff failed to present any evidence that he was qualified for pay increases. Even if he was qualified, he failed to prove that the adverse action caused him to be treated differently than other similarly situated employees.

Even if Plaintiff had established a *prima facie* case of race discrimination, Defendants have offered legitimate, nondiscriminatory reasons for their actions. The employer need only articulate a nondiscriminatory rationale; it need not prove it. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). Here, Defendants contend that Plaintiff's pay increases were based on a very specific rating system and that Dean Meezan weighted Plaintiff's administrative duties as 50% of the rating, differing from his predecessor.

Plaintiff cannot demonstrate that Defendants legitimate reasons for their actions were in fact only a pretext for intentional discrimination. Plaintiff has not offered any proof that

---

[6] With respect to the 2007 Annual Raise, Plaintiff did not submit a dossier as is required to receive a raise and therefore no raise was given.

Defendants' reasons lacked a factual basis, were insufficient to motivate their actions, or were anything but the product of sound and honest business judgment. Ultimately, Plaintiff's theory of race discrimination is based solely on his unsupported speculations of Dean Meezan's racial bias, and that is not enough to establish pretext or to survive summary judgment. *See Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 623 (6th Cir. 2003).

Based on the above, the Court finds that Plaintiff has failed to adduce more than a scintilla of evidence to show that he was qualified for the salary increases he sought, and has similarly failed to show that Defendants' stated reasons for the amounts of the increases were a pretext for discrimination based on race.

### 3. Not receiving the Climate Survey Responses as Requested

Plaintiff has failed to establish that any such data was destroyed. At the very least, he alleges there was a delay in providing the surveys to him. However, Plaintiff has not established that such a delay in providing information constitutes an adverse employment action. *See Mayers v. Campbell*, 87 Fed. Appx. 467, 471 (6th Cir. 2003) (delay in removing documentation not materially adverse). Accordingly, Plaintiff has failed to prove a claim of race discrimination in the delay in providing the climate survey responses.

### B. Retaliation

Plaintiff alleges that he was retaliated against when (1) he was given an evaluation in 2006 that resulted in a 1.5% annual raise; (2) he was given a mid-year evaluation in 2007 that resulted in a 2.47% raise; and (3) Dean Meezan filed an internal complaint of harassment against Plaintiff. The Complaint does not allege that having been relieved of his duties as Director of

the Bachelor of Science and Social Work Program was retaliatory, although he claimed it was in his deposition.

Defendants argue that they are entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff cannot establish a *prima facie* case of retaliation. Defendants further argue that they had legitimate, non-retaliatory reasons for all of its actions regarding Plaintiff and that he cannot establish that such actions were pretextual. This Court agrees.

Title VII prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The elements of a *prima facie* case of retaliation are:

> (1) that he engaged in activity protected by Title VII; (2) that the defendant knew of this exercise of his protected rights; (3) that the defendant consequently took an employment action adverse to plaintiff; and (4) that there is a causal connection between the protected activity and the adverse employment action.

*Stouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001); *see also Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986) *cert. denied*, 478 U.S. 1006 (1986). A plaintiff may satisfy the participation element of a *prima facie* case for retaliation by showing he reasonably believed his activity was protected. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to come forward with a legitimate, non-discriminatory and non-retaliatory reason for the adverse action against the plaintiff. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981). If the defendant comes

forward with a legitimate, non-discriminatory and non-retaliatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination or retaliation. *Hicks*, 509 U.S. at 512 n. 4; *Burdine,* 450 U.S. at 253. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-4(a), prohibits "discrimination" against persons who have engaged in protected activity, without reference to "compensation, terms, conditions, or privileges of employment," etc. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).[7] This does not encompass "trivial" harms, but it does protect against actions sufficiently serious that they "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* Although this is an objective standard, its application "'often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the

---

[7] The Supreme Court in *Burlington Northern* resolved a long standing split in the circuits over the appropriate standard for Title VII's anti-retaliation provision, which prohibits an employer from discriminating against an employee because that employee has engaged in activity protected by Title VII. 548 U.S. 53. Prior to *Burlington Northern*, many circuit courts, including the Sixth Circuit, applied the same standard for retaliation that they applied to a substantive discrimination offense when defining the "level of seriousness to which harm must rise before it becomes actionable retaliation." *Id.* In *Burlington Northern*, the Court recognized that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," and thus the provisions "are not coterminous." *Id.* The Court rejected the Sixth Circuit's requirement that a Title VII plaintiff claiming retaliation demonstrate an adverse employment action. Instead, the Court adopted the less stringent standard utilized by the Seventh and District of Columbus Circuits: "In our view, a plaintiff must show that a reasonable employee would not have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68.

physical acts performed.'" *Id., quoting Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81-82 (1998).

### 1. Demotion as Director of the Bachelor of Science and Social Work Program

Plaintiff contends that Defendants retaliated against him for requesting salary information regarding gender discrimination. Plaintiff asserts that he reasonably believed that there was gender discrimination with respect to compensation. Defendants argue that merely seeking information is not protected activity under Title VII.

Activity may be protected by Title VII under either the "participation clause" or the "opposition clause." There is no good faith or reasonableness requirement for participation clause conduct, such as filing an EEOC charge. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 581-82 (6th Cir. 2000). Plaintiff's complaints of retaliation are subject to the opposition clause. "A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989). That belief must be objectively reasonable as well. *See Clark City School Dist. v. Breeden*, 532 U.S. 268, 271 (2001).

Defendants assert that merely seeking information, rather than asserting that the employer has discriminated, is not opposition clause activity. Essentially, Plaintiff must assert that Dean Meezan has broken the law. The Supreme Court recently addressed this issue in *Crawford v. Metro. Gov't of Nashville & Davidson Co.*, 129 S. Ct. 846, 851 (2009). The *Crawford* Court held that the protection of the opposition clause extends to an employee who was terminated after she testified involuntarily in an internal investigation of alleged sexual

harassment. The *Crawford* plaintiff "did 'not claim to have instigated or initiated any complaint prior to her participation in the investigation, nor did she take any further action following the investigation and prior to her firing.'" *Id.* at 850. Rather, she simply cooperated in the investigation, responded to questions posed by her employer and, in doing so, testified unfavorably against a supervisor who was the subject of the investigation triggered by another coworker's complaints.

The Court abrogated the Sixth Circuit's view that the opposition clause "'demands active, consistent "opposing" activities to warrant . . . protection against retaliation'" and that an employee must "instigat[e] or initiat[e]" a complaint to be protected. *Id.* at 851. Instead, the Court held that in this context, the "ordinary meaning" of the undefined statutory term "oppose" should be utilized, which includes the definitions "confront[ing]," "resist[ing]," and "withstand[ing]" discriminatory conduct; or, "to be hostile or adverse to, as in opinion." *Id.*

The Sixth Circuit analyzed *Crawford* in its recent decision, *Thompson v. North American Stainless*, 567 F.3d 804 (6th Cir. 2009), holding that the plaintiff, who alleged he was terminated in retaliation for his fiancee filing an EEOC charge, failed to raise a genuine issue of material fact that he engaged in protected activity by personally opposing a discriminatory practice under Title VII's anti-retaliation provision.

Plaintiff's only action in this case was requesting information because he believed he had a claim. There is no evidence that Plaintiff engaged in any practice of opposing a discriminatory practice. Plaintiff stated that "[a]t this point I don't have an issue to discuss." He also said he had no proof of wrongdoing and was just investigating. (Alexander Dep. I at 98-99). Further, Plaintiff cannot establish that Dean Meezan's treatment of him differed after his alleged putative

protected activity. Plaintiff's only allegation is that Dean Meezan was "cooler" towards him. A plaintiff's subjective beliefs or impressions are insufficient to create an inference of retaliation. *Burch v. City of Nacogdoches*, 174 F.3d 615, 633 (5th Cir. 1999). To establish the causal connection required in the third prong, a plaintiff must adduce "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken" but for the plaintiff's participation in a protected Title VII activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). The Sixth Circuit noted:

> Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.

*Nguyen*, 229 F.3d at 563. Based upon the foregoing, Plaintiff cannot establish the requisite causal link for a *prima facie* case.

## 2. 2006 Annual Raise

Plaintiff asserts that he received a lesser salary in retaliation for opposing Dean Meezan's suggestion that students sign a social work pledge.[8] The pledge stated that the students would support the NASW Code of Ethics. Dean Meezan described this as a "rite of passage" into the professional social work community. (Meezan Dep. I at 14-19). The NASW code binds all social workers in their professional practice and addresses how minority groups, including homosexuals, are to be treated. (Meezan Dep. I at 15; Alexander Dep. I at 15-20). Plaintiff voiced his concerns over signing such a agreement that he characterized as accepting

---

[8] Plaintiff again asserts that he was retaliated against with a lower salary increase for requesting information regarding faculty salaries in 2005. However, as previously discussed, this does not constitute a protected activity under Title VII.

homosexuality. Plaintiff believed that some religious students may believe they were discriminated against if asked to sign such a pledge. He told the Dean that the school could be subjected to lawsuits. Even though the pledge was never implemented, Plaintiff argues that he received the lowest raise among all the professors in the college, 1.5%, as a result of voicing his concerns over this pledge.

Defendants do not dispute that the "warning" regarding the pledge may be protected activity under Title VII (Defs' Reply at 31). However, Defendants maintain that Plaintiff cannot establish a *prima facie* case of retaliation because the alleged protected activity was temporally remote from the annual evaluation. Plaintiff's comments regarding the pledge occurred in July 2005, and Plaintiff met with Dean Meezan to discuss his 2006 annual raise in May 2006.

Temporal proximity, to be relevant in establishing retaliation, must be very close. *See Clark County School Dist. v. Breeden*, 523 U.S. 268 (2001). The Sixth Circuit has held that mere temporal proximity between protected activity and the adverse action is insufficient to establish the causal connection element of a retaliation claim, without additional evidence of retaliatory animus. *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). Such additional evidence might include treatment different from that given similarly situated employees who did not engage in protected activity. Plaintiff asserts that all the other professors who did not engage in protected activity received a higher annual raise than he did. However, as previously discussed with respect to Plaintiff's race discrimination claims, he has not presented any evidence of any other similarly situated professors, e.g. professors who also had administrative duties. Nor has Plaintiff presented any evidence that he received a low raise for retaliatory reasons. Plaintiff did receive a raise, and it was based on the standards set forth by Dean Meezan. Again, the major

factor in Plaintiff's evaluation was that his administrative duties were weighted 50%, and he failed to complete his assigned tasks as an administrator. Accordingly, Plaintiff has failed to establish a *prima facie* case of retaliation.

### 3. 2007 Mid-Year Raise

Plaintiff engaged in protective activity in December 2006, when he filed his EEOC charge. Plaintiff asserts that his 2007 Mid-Year Raise of 2.47% was in retaliation for filing the charge. Defendants, nonetheless, argue that Plaintiff's retaliation claim fails because Plaintiff has no evidence that he received the rating he received by the panel because of his protected activity.

Plaintiff asserts that the panelists were not independent arbiters and by rating Plaintiff lower, they would increase the amount they would receive. Specifically, Plaintiff argues that Drs. Lee and Richardson benefited financially by giving Plaintiff a low rating. Plaintiff's argument that the review panel was motivated by greed completely undercuts his argument that he was given a low raise in retaliation for filing an EEOC charge. Therefore, Plaintiff has failed to present a *prima facie* case of retaliation.

### 4. Dean Meezan's Internal Complaint

On March 5, 2008, Dean Meezan filed a complaint against Plaintiff with OSU's Human Resources office. The complaint detailed much of the conduct described in the aforementioned facts. After an investigation, OSU issued a report on January 30, 2009, finding that Plaintiff had engaged in most of the conduct complained of, that his conduct was reprehensible, and that if it continued, further disciplinary action would be taken. Plaintiff asserts that Dean Meezan filing this complaint was intended to "maliciously harass the Plaintiff and cost him money in an effort

to avert his efforts the lawsuit.  Thus, by costing the Plaintiff additional monetary [sic] and time in an effort to defend against a complaint that was maliciously filed, the Plaintiff was diverted from pursuing his lawsuit" (Pl.'s Memo. in Opp. at 44).

Defendants argue that Dean Meezan's complaint was not an adverse employment action. Defendants state that "the mere lodging of a complaint cannot reasonably chill an employee from himself complaining of discrimination." (Defs' Mot. at 42).  This Court agrees.  Even if it the complaint constituted an adverse employment action, Plaintiff has not presented any evidence creating a causal link of retaliation between Dean Meezan's complaint and Plaintiff's filing charges with the EEOC or the ability to litigate this case.  Finally, Plaintiff cannot present any substantial evidence disputing the facts reported by Dean Meezan in his complaint.  Thus, Plaintiff cannot establish that Dean Meezan did not have a legitimate, non-retaliatory reason for seeking the assistance of the Office of Human Resources to curb Plaintiff's behavior.  Indeed, the report issued by Olga Esquivel-Gonzalez warned Plaintiff that continued misbehavior may result in serious sanction, but it also warned both Plaintiff and Dean Meezan against any retaliation.  *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 442 (5th Cir. 2007) ("We conclude that the written warning to DeHart would not 'have dissuaded a reasonable worker from making or supporting a charge of discrimination.'  In the first place, there were colorable grounds for the warning and a reasonable employee would have understood a warning under these circumstances was not necessarily indicative of a retaliatory mind-set.").  Therefore, Plaintiff has failed to adduce evidence to support a prima facie case of retaliation sufficient to withstand Defendants' summary judgment motion.   Additionally, Plaintiff's retaliation claims must fail because he is unable to show that Defendants' proffered non-

retaliatory reasons for its actions are a mere pretext for retaliation. Defendants are therefore entitled to summary judgment in their favor on Plaintiff's Title VII retaliation claim.

## C.    Civil Rights Violation

Plaintiff alleges that his right to due process of law was violated by the alleged destruction of the climate survey responses. The Climate Survey consisted of open-ended and close-ended questions that were administered online, and to which faculty and staff responded anonymously. The themes from the open-ended questions were summarized for Dean Meezan's use. A spreadsheet of tabulated scores was compiled for each of the close-ended questions. Dean Meezan never received any of the raw data. (Meezan Dep. I at 65-67, 203).

Before the surveys were tabulated, Plaintiff made a public records request for each individual survey completed by the faculty and staff. (Alexander Dep. I at 149-51). He was informed by Jan Neiger, OSU's legal counsel, that he would receive "copies of all the surveys, including written comments." (Alexander Dep. Ex. 122 at 7). However, on November 21, 2006, Plaintiff was informed by Mr. Lewellen that the survey results were disposed of pursuant to OSU's records retention policy, but the information contained in the individual surveys was simply moved to a new medium. (*Id*. at 5). Plaintiff was not satisfied with the information he received because the results were aggregated. He could not compare individual responses to discover a pattern in any set of individual. (Alexander Dep. I at 154-60, 163-64).

Defendants now represent that Plaintiff was provided with 33 sets of individual survey responses in Excel spreadsheet formula, so that each individual's anonymous response to each question could be correlated with that individual's response to all other questions. (Alexander Dep. Ex. 123). Plaintiff still contends that the survey results that have been provided to him

were altered. However, Plaintiff's only basis for this contention is that he was informed that there were 31 respondents, rather than 33. (Alexander Dep. I at 165-66).

Therefore, Plaintiff is essentially claiming that his civil rights were somehow violated by the delay in receiving the survey results. Plaintiff has failed to establish that he was prevented from filing suit because of this delay, or that the delay rendered this action ineffective to vindicate his rights. The Court rejects this claim and finds that the delay has not harmed Plaintiff. In fact, at the time of his deposition, he had yet to fully review the climate survey responses. (Alexander Dep. I at 173-75). Defendants are therefore entitled to summary judgment on Plaintiff's claim for violation of his right to due process of law.

## D.    Qualified Immunity

The aforementioned discussion addresses each of Plaintiff's claims and concludes that Defendants are entitled to summary judgment on all the claims. Therefore, the Court does not find it is necessary to address Defendants' qualified immunity argument.

## IV.    DISPOSITION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment.

Documents 43, 46, and 47 regarding discovery are now **MOOT**.

The Clerk shall remove Documents 43, 46, 47, 55 and 71 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**


_____/s/ George C. Smith_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**